**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**FELLOWES, INC.**

       **Plaintiff,**

       **v.**                                **Civil Action No. 2:06cv289**

**MICHILIN PROSPERITY COMPANY,**
**LTD. and INTEK AMERICA, INC.,**

       **Defendants.**

## OPINION & ORDER

       This case concerns two patents related to paper shredders, U.S. Patent No. 6,260,780 (the "'780 patent") and U.S. Patent No. 7,040,559 (the "'559 patent").  A jury trial was held before this Court from May 1, 2007, to May 14, 2007, on Plaintiff Fellowes, Inc.'s ("Fellowes'") claims that Defendants Michilin Prosperity Company, Ltd. ("Michilin"), and Intek America, Inc., ("Intek") (collectively "Defendants") infringed the '559 and '780 patents.  Defendants counterclaimed that both patents were invalid because they were anticipated and obvious under 35 U.S.C. §§ 102 and 103, and contended that they did not "sell[]" or "offer[] to sell" the allegedly infringing products "within the United States," or "import[]" them "into the United States."  35 U.S.C. § 271(a).  Defendants admitted infringement of the '559 patent, if it was valid, and denied infringement of the '780 patent.  On May 18, 2007, the jury returned a verdict finding that Defendants did not prove that the '559 and '780 patents were anticipated or obvious.

The jury was unable to reach a verdict as to whether Defendants infringed the '780 patent.[1] Following the verdict, the parties renewed their motions pursuant to Federal Rules of Civil Procedure 56 and 50(b) for summary judgment, or judgment as a matter of law, on Fellowes' claim that the '780 patent was infringed.  Defendants also moved for judgment as a matter of law that the '780 and '559 patents were invalid and, in the alternative, for a new trial.  For the reasons stated herein, the Court **FINDS**, as a matter of law, that Defendants directly infringed claim 3 of the '780 patent, and claims 1, 14, 15, and 16 of the '559 patent, and induced infringement of both patents.  The Court further **FINDS**, in accordance with the jury verdict, that U.S. Patent No. 6,260,780 and U.S. Patent No. 7,040,559 are both valid patents.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    A.      **Factual Background**

Fellowes is an Illinois corporation that manufactures paper shredders.  It is the assignee of the '559 patent, which is entitled "Shredder With Lock For On/Off Switch," and the '780 patent, which is entitled "Paper Shredder Shaft."  The '559 patent discloses an invention to discourage a shredder from being inadvertently turned on.  At issue in the '780 patent is a "V-shaped" "spacer" for use in a "cross-cut shredder" that purportedly is better able to dislodge paper chips that fall into the spaces between the shredder's cutting blades and tend to jam the shredder, preventing its operation.  The '559 patent was applied for on April 2, 2004, and issued by the United States Patent and Trademark Office (USPTO) on May 9, 2006.  The '780 patent

---

[1]The jury, after several days of deliberations, indicated in a note to the Court that it was unable to agree on a verdict on infringement of the '780 patent.  Although it was instructed not to state its numerical division at any time, the jury stated that the eleven jurors were split, 10 to 1, in favor of a finding of infringement of the '780 patent.  It was clear to the Court that a unanimous verdict was not possible.

was applied for on August 26, 1999, and issued on July 17, 2001.

Michilin is a Taiwanese corporation that owns factories in China that manufacture several models of shredders.  Intek, a corporation incorporated in California and based in Torrance, California, markets Michilin shredders to retailers in the United States.  Fellowes contends that Michilin shredders with "Diamond Cut" disks infringe the "V-shaped" spacer claimed in the '780 patent, and that Michilin shredders with "Child Resistant Safety" (CRS) switches infringe the "switch lock" that locks the "on/off switch" claimed in the '559 patent.

### B.      Procedural Background

Fellowes alleges that Defendants directly infringed both patents by offering to sell, selling, and importing the CRS and Diamond Cut shredders (collectively, "the accused shredders" or "accused products") in violation of 35 U.S.C. § 271(a), and induced infringement of both patents in violation of 35 U.S.C. § 271(b).  Defendants stipulated that the CRS shredders infringe the '559 patent, but contended that the Diamond Cut shredders did not infringe the '780 patent, and that both patents were invalid under 35 U.S.C. §§ 102 and 103.  On May 11, 2007, at the conclusion of all the evidence but before submission of the case to the jury, both parties moved for judgment as a matter of law as to infringement and validity.[2]  The defendants contended that they did not "offer[] to sell," "sell[]," or "import" any goods "within the United States" primarily because goods were shipped "Free on Board China" or "FOB China."[3]  §

---

[2]The parties renewed their motions for summary judgment, which, prior to trial, the Court had denied without prejudice to their renewal at the appropriate time during trial.

[3]"FOB" or "Free on Board" is a "method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer."  MEMC Elec., 420 F.3d at 1374 n.3.

271(a).  The Court denied the motions except that it ruled, as a matter of law, that Defendants "offered to sell" the accused shredders in the United States during the terms of the '559 and '780 patents under § 271(a).  The Court ruled that since the Defendants learned of the existence of the patents on approximately May 23, 2006, they induced infringement of both patents under § 271(b) as of that date, assuming they were directly infringed.[4]  Following the jury's verdict, all parties filed motions pursuant to Rules 50(b), 56(c), and 59 for judgment as a matter of law, summary judgment, and/or a new trial on infringement of the '780 patent and on the validity of both patents.

## II.   DISCUSSION

### A.   Legal Standard for Judgment as a Matter of Law and New Trial

Pursuant to Federal Rule of Civil Procedure 50(a), judgment as a matter of law prior to submission of the case to the jury is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ."  Fed. R. Civ. P. 50(a)(1).  A renewed motion for judgment as a matter of law pursuant to Rule 50(b) is governed by the same standard. Fed. R. Civ. P. 50(b); see Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998).  To determine whether to grant a motion for judgment as a matter of law, the Court "must examine the evidence in the light most favorable to the non-moving party and determine 'whether a reasonable trier of fact could draw only one conclusion from the evidence.'"  Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994) (quoting Townley v. Norfolk & W. Ry. Co., 887

---

[4]The Court also wishes to make clear that it refused certain changes to the jury instructions prior to instructing the jury because the parties were required to submit proposed instructions before trial, and there had to be an end to what had become a billable hours bonanza.

F.2d 498, 499 (4th Cir. 1989)).

A motion for a new trial pursuant to Rule 59(a) should only be granted if "1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice . . . ." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 650 (4th Cir. 2002); see Fed. R. Civ. P. 59(a).

## B.    Direct Infringement

Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

### 1.    Offers to Sell and Sales

An "offer to sell" is defined "according to the norms of traditional contractual analysis." Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1255 (Fed. Cir. 2000); see 35 U.S.C. § 271(i) (defining an "offer to sell" or an "offer for sale" as "that in which the sale will occur before the expiration of the term of the patent"). Thus, the defendant must "communicate[ ] a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Rotec Indus., 215 F.3d at 1257 (quoting Restatement (Second) of Contracts § 24 (1979)). A sale is defined with reference to its ordinary meaning, i.e. "1. The transfer of property or title for a price. 2. The agreement by which such a transfer takes place. The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1319 (Fed. Cir. 2005) (citing Black's Law Dictionary 1337 (7th ed. 1999)).

"It is well established that the reach of Section 271(a) is limited to infringing activities that occur within the United States." MEMC Elec. Materials Inc. v. Mitsubishi Corp., 420 F.3d 1369, 1375 (Fed. Cir. 2005). The situs of infringement is determined according to the places of contracting and performance, not solely the place where legal title passes. See N. Am. Philips v. Am. Vending Sales, Inc., 35 F.3d 1576, 1579-80 (Fed. Cir. 1994) (in personal jurisdiction context). The location of passage of title, standing alone, without more, does not determine where a "sale" or "offer to sell" occurs for purposes of § 271(a). See MEMC Elec., 420 F.3d at 1377 ("[S]imply because an article is delivered 'free on board' outside of the forum, a 'sale' is not necessarily precluded from occurring in the forum."); SEB, S.A. v. Montgomery Ward & Co. Inc., 412 F. Supp. 2d 336, 340 (S.D.N.Y. 2006) ("Simply because Pentalpha sold the deep fryers F.O.B. China does not mean that it did not offer to sell the deep fryers in the United States."); Cybiotronics, Ltd. v. Golden Source Elecs., Ltd., 130 F. Supp. 2d 1152, 1176 (C.D. Cal. 2001) (that title passed "FOB Hong Kong" was not determinative in determining situs of sale). The documentary evidence clearly shows that most of the accused shredders were sold "FOB China," meaning title to the shredders and risk of loss passes to the purchaser in China.

Fellowes put on an abundant amount of evidence at trial as to Michilin and Intek's sales activities within the United States. Defendants insisted in their pretrial motions that their sales activities did not occur "within the United States" since, in most cases, title to the shredders passed to the retailers in China. At trial, however, much of Fellowes' evidence was unchallenged. Defendants did not argue the issue during oral argument other than to assert that

it was a question of law for the Court.[5]  During trial, Intek did not dispute that it offered to sell

accused shredders in the United States.  5/03/07 Tr. 460:23-25 ("MR. EDWARDS [counsel for

Defendants] . . .  "There's not a dispute that Intek offers these shredders for sale in the United

States.").  Asked whether Intek "sells shredders to Office Max, Wal-Mart, Staples, Target, and

Big Lots," Intek's President, Herman Chang, testified, "I can only answer your question this

way: That we offer the product for sale."  5/03/07 Tr. 432:24-25; 433:1-4.  Mr. Chang also

admitted that Intek sold shredders.  Id. at 426:22-25 ("Q. Intek sells Michilin shredders, correct?

A. Yes."); id. at 462:17-18 ("THE COURT: So you don't sell shredders? A.  We sell

shredders.").[6]

Michilin's defense centered around "FOB China" collapses under the weight of the

undisputed evidence that the United States, not China, was the situs of Defendants' offers to sell

as well as sales themselves.  There is no dispute that Michilin and companies under its control

design and manufacture shredders in China and sell them to U.S. retailers including Office

Depot, Office Max, Target, Staples, and Wal-Mart, under private brands owned by the retailers,

which sell them to consumers at retail stores throughout the United States.  Michilin produced

dozens of commercial invoices *on Michilin letterhead* documenting these sales to the retailers.

---

[5]Asked by the Court whether Defendants denied importing the accused shredders,
Defendant's counsel stated: "The facts are what they are, and I don't dispute it.  We've admitted
everything that we've done.  We've not offered any contradicting evidence.  They are what they
are.  If that means we import, then we import.  So it seems to me that that has to be a legal
conclusion."  5/11/07 Tr. 1344:8-12.

[6]Mr. Chang did try to help Defendants' "FOB China" defense by testifying that he
"couldn't give you a definition" of the word "sale."  5/04/07 Tr. 462:4.

See, e.g., Pl.'s Ex. 2114; Jason Lee Dep. 61:11-25.[7]   The United States is Michilin's primary

market.   In 2004, about 85 percent of its shredders were available for sale in the United States.

"Over 95 percent" of Michilin's sales are "direct import," meaning the shredders are sold "FOB

China."   5/07/07 Tr. 639:14-16, Seung Lee Test.   According to Intek, a "direct import"

supposedly works as follows.   The retailer sends a purchase order to Intek in Los Angeles, which

Intek rewrites and emails or faxes to Michilin in Taiwan.   Michilin sends a work order to one of

its two factories in China, Forta and Enable.   The shredders are manufactured, then shipped by

truck to the port in China, typically at Yantian or Hong Kong, where they are delivered to the

retailers' forwarder or broker.   The retailers take title to the shredders at the port in China, ship

them to the United States, and deliver them to their stores.   Intek claims that it is paid by the

retailers under a letter of credit paid to Intek's bank in Taiwan.   See Pl.'s Ex. 2010.   The accused

CRS shredders were shipped starting in January 2005 and during the '559 patent term that began

in May 2006.[8]   The Diamond Cut models were sold beginning in as early as March 2004 and

---

[7]For example, a shipping invoice on Michilin letterhead dated August 9, 2004, lists the sale to Wal-Mart of "7970 PCS" of a WQ60B "6 SHEET DIAMOND CUT SHREDDER" from Yantian to "LA."  Pl.'s Ex. 2114 at 000622.  The invoice states: "Shipped By: FORTA INTERNATIONAL CO. LTD."  Id.  Michilin owns Forta International, one of its factories.

[8]Intek Vice President Seung Lee identified the following models as having CRS and being sold in the United States after May 2006: SPL-1201X, ID-QE40B, ID-S60B, ID-100M, SQ70B, OM96143 (MQ100B), OM96146 (MQ120D), OM96430, OM96431, OM96578 (MQ80B/MQ81B), OM96581(MQ61B), OM96582 (MQ80M), OM96141, OM96145, DQ120D, DQ121MD, DQ61Ba, DQ61M, DQ81M, DQ83M, DSD160D, DXD-120D, DX-180D, DX-200D, TQ102B, TQ120F, TQ81B, TQ81M, TQE41B, WQ120D, WQ81B, and WS60BD.  Pl.'s Exs. 5001, 5002, 5003, 5004, 5005; 5/04/07 Tr. 553:12-576:15.  In addition, Michilin produced a list of models that purportedly represents all accused models sold in the United States.  Pl.'s Ex. 2112; Jason Lee Dep. 50:10-51:03; 60:23-07.

8

after the issuance of the '780 patent in July 2001.[9]  Intek claims that it communicates with retailers in the United States on Michilin's behalf, takes orders only for Michilin and supplies only Michilin shredders to retailers.  Intek negotiated and signed "vendor agreements" with Office Depot, Wal-Mart, Target, Office Max, and Staples under which the retailers agreed to purchase, and Intek agreed to supply, Michilin shredders for ultimate sale in the United States.  See, e.g., Pl.'s Ex. 2224 (Office Max agreement); 05/03/07 Tr. 448:9-11, Herman Chang Test.  Under these agreements, Intek agreed to provide retailers with product liability insurance and consented to the jurisdiction of state courts.  The agreement with Office Max identifies by name Michilin officials, including its General Manager, T.C. Wang, under the heading "Foreign Supplier Contacts."  Pl.'s Ex. 2224 at INT 07972.  These contracts are the agreements by which Defendants claim to sell accused shredders to U.S. retailers and are thus an element of a "sale" occurring "within the United States[.]"  § 271(a); see also NTP, 418 F.3d at 1319.

The purchase orders sent to Intek and Michilin by retailers are based on "quote sheets" that Intek *gives to retailers* that offer specific prices for Michilin shredders, and product

---

[9]5/08/07 Tr. 743:14-20, T.C. Wang Test.; but see id. at 777:16-22, T.C. Wang Test. (stating that Diamond Cut was first offered for sale in the United States in August 2004).  The following shredders having Diamond Cut disks were sold by retailers the United States after July 2001: ID-QE40B, SQ70B, OM96142 (MQ70B), OM96143 (MQ100B), OM96146 (MQ120D), OM96431, OM96578 (MQ80B/MQ81B), OM96581 (MQ61B), OM96582 (MQ80M), DQ120D, DQ121MD, DQ60B, DQ61Ba, DQ61M, DQ80B, DQ80M, DQ81M, DQ83M, TQ102B, TQ120F, TQ81B, TQ81M, TQE41B, WQ120D, WQ81B, WQ60B, WQ60B-M, WQ61B, WQ83M, WQ83MI, and WQ80B.  See Pl.'s Ex. 5001, 5002, 5003, 5004, 5005, & 5009; 5/04/07 Tr. 553:12-576:15, Seung Lee Test.  Michilin's SPL-1506X, which has CRS but not Diamond Cut, was sold by Michilin to Executive Machines, Inc. (EMI) (which sells to Staples) after May 2006 and the SES-D600, which has Diamond Cut, was sold to EMI (which sells to Meijer and Home Depot) for at least part of 2005.  The UNV38008, 38010, and 38012, each of which are Diamond Cuts, were sold to United Stationers (USS), which then sold them in the United States after July 2001 and after May 2006.  5/08/07 Tr. 728-741:9, T.C. Wang Test. & Pl.'s Exs. 1539, 1543, 2301, 2385, 2302, 2303, 2386, 1554, 1555, 1556, 2327, 2330, 2333, 2328, 2329, 2331, 2332, 2334, & 2335.

specifications.  5/04/07 Tr. 547:11-548:7, Seung Lee Test.  The "quote sheets" constitute "offers

to sell" because they manifested a willingness to be bound at a specific price.  See 3D Sys., Inc.

v. Aarotech Labs., Inc., 160 F.3d 1373, 1379 (Fed. Cir. 1998) (finding that price quotation letters

can be "offers to sell"); MEMC Elec., 420 F.3d at 1376 (citing Rotec Indus., 215 F.3d at 1251)

("[T]he e-mails, while containing a description of the allegedly infringing wafers, do not contain

any price terms.  Accordingly, on their face, the e-mails cannot be construed as an 'offer' which

Samsung Austin could make into a binding contract by simple acceptance.").  Morever, because

a contract is formed when a seller offers a product at a specific price and the buyer agrees to

purchase at that price, the retailers' acceptance of a particular price offered in a "quote sheet" by

sending a purchase order constituted an essential element of a "sale" that occurred *within* the

United States.

On July 25, 2006, Intek participated in a "vendors" event at Target headquarters in

Minneapolis, Minnesota, during which it gave a presentation on Michilin shredders and won a

bid to provide them to Target.  Intek made similar bids to Staples.  5/4/07 Tr. 581:7-9, Seung Lee

Test. ("Q.  And does Intek offer for sale the paper shredders at those meetings in Staples in

Framingham, Massachusetts?  A.  Yes.").  These particular bids were both "sales" and "offers to

sell" on the part of Intek, with Michilin being the ultimate beneficiary.

Intek, which is represented by the same counsel as Michilin, acts under the authority of

Michilin and exclusively for Michilin's benefit.  Intek was established by Michilin in November

2005 with a $1 million investment.  The four owners of Michilin, each of whom own 25 percent

of Michilin, own 73 percent of Intek.[10]  Intek was created to avoid risk to Michilin, according to

---

[10]Pl.'s Ex. 2007.  Michilin's four shareholders and its board of directors are: Tie-Chung
(T.C.) Wang, Ying-Shen (Frank) Chang, Cheng-Chung (David) Gao, and Mrs. Li-Chu Lin.

the deposition testimony of T.C. Wang, one of Michilin's four owners and a partial owner of Intek. One of Michilin's owners and its Chairman, Frank Chang, who also owns 19 percent of Intek, testified that Michilin sells its shredders to U.S. retailers "through" Intek. See Chang Dep. 39:10-13 ("Q. How does Michilin offer shredders for sale in the United States? A. Well, we sell them through an import/export company in the U.S. [Axeus].").[11] Frank Chang also testified that Intek is "a sales company, it's an importer, and I am the labor worker who is doing the manufacturing and work . . . . I am not familiar with the demand in the U.S. market, so it is ideal to do business through them." Id. at 408:04-10. Nearly all of Intek's revenue is funneled overseas to Michilin. Intek only pays expenses. Intek earned approximately $56 million in gross revenue for Michilin shredders sold in the United States in 2006. Of that, approximately $54 million, or 95 percent, was sent to Taiwan, partly to pay Michilin-owned factories. Intek President Herman Chang is paid a salary but as an Intek shareholder receives none of Intek's profits. Intek has not made a single dividend or profit distribution to its investors. Jason Lee Dep. 17:02-4. It is only through Michilin that disbursements of profits are made, and these are done outside the United States and beyond the scope of U.S. tax laws.

Significantly, Michilin—specifically T.C. Wang, its General Manager, who is located in Taiwan—personally sets and controls the prices of the shredders. 5/08/07 Tr. 773:23-24 ("Generally speaking, we provide price quote to Intek and Intek was to sell it to the customer."); Jason Lee Dep. at 146:11-12 ( "[G]enerally speaking, he's [T.C. Wang] the one who determines the price."). Jason Lee, Michilin's Vice President and an Intek investor, testified that Mr. Wang,

---

[11]Prior to November 2005, Michilin used a company called Axeus, which, like Intek, was based in Torrance, California, to market its shredders. Michilin's four owners owned about "30-plus percent" of Axeus. 5/07/07 Tr. 698:12-13, T.C. Wang Test; see also Jason Lee Dep. 28:25-29:02 (Axeus and Intek "have the same people in charge, so they consider they are the same.").

General Manager of Michilin, negotiated directly with U.S. retailers over prices:

> A. The price is set—basically, the price is set by the discussion between T.C. Wang and customers.
>
> Q. So T.C. Wang negotiates the price with the customers?
>
> A. Yes.
>
> Q. Does he negotiate directly with the Office Depots and Staples and Target and Wal-Mart?
>
> A. Let's take Office Depot as an example.  In the earlier days, yes, Mr. Wang is the one who negotiates the price with Office Depot, because in the earlier days Axeus did not participate in that.

Id. at 105:12-22.  Clearly T.C. Wang, General Manager of Michilin, dealt directly with customers in the United States and set and negotiated the prices which the U.S. retailer agreed to, constituting an offer by Michilin and an acceptance by the retailer in the United States.

The evidence establishes that Intek is but an agent of Michilin and does not act independently in any way or fashion.  Intek was nothing more than an employee of Michilin.  It does not pay Michilin for products, but merely sends all of its revenue to Michilin except for those salaries paid by Intek and expenses of Intek.  This is not to say, however, that Michilin's liability for direct infringement turns solely on an agency relationship with Intek, since Michilin itself sets the prices, negotiates directly with U.S. customers, communicates directly with customers in the United States, and receives the net revenue.  Michilin's General Manager, T.C. Wang, regularly visits retailers in the United States to discuss the sale of Michilin shredders.  In February 2007, he visited Office Max to participate in a bidding (an "offer to sell") in which Office Max selected Michilin to supply it with shredders (a "sale").  Mr. Wang testified that he spoke with customers about the accused CRS switch, an admission that he dealt directly with

customers located in the United States.  5/08/07 Tr. 753:20, 754:7-14 ("Q.  And your position is that when you showed the child resistant safety switch to customers, they asked, quote 'why do I need that function because it adds cost,' right?  A.  Right.  Their reaction was that.").  In 2005, Jason Lee, Michilin's Vice President (who is not an employee of Intek), accepted a "Vendor of the Year" award from Office Depot on Michilin's behalf.  The acceptance of this award was a recognition by Michilin that it sold and offered to sell to Office Depot.

Michilin as well as Intek attended a consumer electronics trade show in Las Vegas, Nevada every year from 2003 to 2006.  During these trade shows, both Michilin and Intek demonstrated Michilin shredders to retailers in a hotel suite.  On "very, very rare" occasions, perhaps once, a retailer purchased a Michilin shredder at such a demonstration; this is evidently both an "offer to sell" and a "sale."  Id. at 773:5-9.[12]  Clearly, Michilin "offer[ed] to sell" its shredders to the various U.S. retailers at the trade show it attended yearly in the United States.

From approximately June 2003 to October 2006, Michilin sold accused shredders directly to Office Depot without Axeus or Intek.  Office Depot would buy the shredders "FOB China" and import them into the United States.  Michilin sent Office Depot commercial invoices *on Michilin letterhead* that document its sales of accused models to Office Depot that were shipped to Orlando, Florida; Los Angeles, California; Grove City, Ohio; Kent, Washington; and

---

[12]Plaintiff's Exhibit 2044-B, a spreadsheet created by Fellowes and, by Court order, filled out by Michilin, is among the evidence that Michilin offered to sell and sold in the United States. One of the spreadsheet's headings states, "Ever Offered for Sale or Sold *by Michilin* in the U.S. Since July 2001 (Y/N)" and another reads, "Currently Offered for Sale or Sold *by Michilin* in the U.S. (Y/N)."  Pl.'s Ex. 2044-B (emphasis added).  On the lefthand side is a list of shredder model numbers.  Underneath the headings, Michilin entered "Y" or "N" responses.  In some cases, a "Y" is entered below the captions regarding sales or offers to sell by Michilin.

Arlington, Texas, from January 2006 to June 2006.[13]  Mr. Wang negotiated prices *directly* with

Office Depot, which is in Florida, without Intek or Axeus' involvement; Office Depot, within the

United States, accepted the price offers made by Mr. Wang; and Office Depot paid Michilin

*directly* using a letter of credit transaction without the intervention of a third party.  This was

clearly shown by the uncontradicted testimony and the documents themselves.  As T.C. Wang

testified:

> Q.  Did there come a time prior to September of 2006 that Michilin did not sell to RT
> Sourcing, but sold to Office Depot and got funds from Office Depot, FOB China?
>
> A.  It was still done through RT, but *we received the funds directly*.
>
> Q.  From Office Depot, correct?
>
> A.  That's right.

5/07/07 Tr. 700:23-701:04 (emphasis added).  Michilin's only attempt at a saving grace is that

title passed "FOB China," but this does not overcome the evidence that an offer was *accepted* in

Florida, where the price was agreed to, that Michilin dealt directly with Office Depot in Florida

and sent commercial invoices to Florida, and that Office Depot directly paid Michilin, not any

other entity.  Michilin's direct sales to Office Depot were "within the United States" under §

271(a) as a matter of law.  These direct sales ceased in October 2006, approximately when Intek

was added to this suit, and Intek became the intermediary for subsequent sales to Office Depot.[14]

---

[13]Pl.s' Ex 2115.  The models sold by Michilin directly to Office Depot without the
involvement of Intek or Axeus included the DQ120D, DQ121MD, DQ61Ba, DQ61M, DQ80M,
DQ81M, DQ83M, DX180D and DX200D.

[14]Intek was added as a defendant on October 13, 2006.  Around that time, Michilin began
selling to Office Depot through Intek.  These recent sales via Intek were sales within the United
States for the same reasons that other sales via Intek occurred within the United States.

In sum, this is not a case in which a foreign manufacturer operating exclusively overseas merely contemplates that its products will ultimately be imported into the United States.  Cf. MEMC Elec., 420 F.3d at 1376 (finding "no evidence of negotiations occurring in the United States"); Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co., Ltd., 479 F. Supp. 2d. 388, 406 (S.D.N.Y. 2007) (finding no "offer to sell" where supply agreement was "negotiated and executed entirely in Hong Kong, and any offer made by Simatelex to Sunbeam was certainly done outside the United States").  The United States is the destination of the majority of the accused shredders, the vendor agreements allowing these sales to occur were negotiated and executed in the United States and governed by U.S. state laws, the price quotes for the shredders were sometimes sent but always received in the United States, and Michilin directly communicated, and negotiated, with its U.S. customers.  The commercial invoices themselves show that the sales were made to retailers in the United States.  Payment was made by the retailer directly to Michilin in many instances.  Intek acted merely as a pass-through.  It sent 95 percent of its revenue to Michilin in 2006.  This evidence, coupled with the parties' admissions, lead the Court to **FIND**, as a matter of law, that Intek and Michilin made "sales" and "offers to sell" of CRS and Diamond Cut shredders within the scope of § 271(a).[15]

##     2.      "Import"

In 1994, Congress amended § 271(a) to include as a separate basis for liability the unauthorized importation of infringing devices into the United States.  See Uruguay Round Agreements Act, Pub. L. No. 103-465, § 533(a)(1), 108 Stat. 4809, 4988 (1994).  Although the statute does not define "imports into the United States" and the term has received relatively little

---

[15]The Court previously ruled that Michilin offered to sell the DQ61Ba and SQ70B because Michilin so admitted in response to a request for admission.  4/13/07 Tr. 47:23-48:15.

interpretation, the plain language of § 271(a) distinguishes "imports" from both "sells" and "offers to sell."  See § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."); see also H.R. Rep. No. 103-826(I), at 8 (1994), reprinted in 1994 U.S.S.C.A.N. 3773, 3780 (Title V "amends the definition of infringing activity to include offers for sale and importation of a patented good . . . .").  Thus, to directly infringe under § 271(a), an importation of an infringing product need not include, nor be followed by, a sale, offer to sell, or any other particular course of action; the infringing activity is the unauthorized importation of an infringing product itself.  Michilin admitted in its Answer to sending the "first shredder of each model of shredder (intended to be offered for sale in the United States) to Underwriters Laboratories, Inc. (UL), in the United States solely to obtain UL approval thereof . . . ."  Answer ¶ 16 [Doc. No. 58].  UL sets safety requirements for electrical products sold in the United States.  Although sending products to the United States to obtain UL approval may not, on its own, be a sale or offer to sell, the fact that Michilin—not Intek or Axeus—sent the products to UL is another nail in the coffin as to an infringing "offer to sell" and "sale" on the part of Michilin because Michilin shredders *must* be certified by UL before they can be sold in the United States.  Moreover, to say that Michilin did not import those shredders sent to UL would defy logic since there is no evidence that anyone else played any role in their delivery to UL.  These shredders sent to UL necessarily were "import[ed] into the United States" unless Michilin could show a different definition of the word "import" than that contained in any recognized English language dictionary.  See e.g.,Webster's Third New Int'l Dictionary 1135 (3d ed. 1981) ("to bring (as wares and merchandise) into a place or country from another country"); The Random House Coll. Dictionary 668 (4th ed. 1973)

16

("to bring in (merchandise) from a foreign country for sale, use, etc."); see also NTP, 418 F.3d at 1314-15 ("In our interpretation of [§ 271(a)], we 'give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'") (citation omitted).

In addition, Intek "import[ed] into the United States" those Michilin shredders that it admits to importing for warranty and service reasons.  § 271(a); see Defs.' Br. in Opp. [Doc. No. 113] at 30.  Intek Vice President Seung Lee testified that Intek imported Michilin shredders that were to be sold at Office Depot, including the DSD160D, which has the CRS switch, and stored them in a leased warehouse in California.  5/04/07 Tr. 590:21-23 ("Q.  So Intek is the importer of those domestic shredders, right?  A. Yes.").  Intek would ship these shredders from the warehouse to the retailer once an order was placed.[16]

As for the shredder sales made "FOB China," courts have recognized that a significant difference exists between importing *into* the United States and exporting *from* another country to the United States.  See, e.g., Cybiotronics, 130 F. Supp. 2d at 1174 ("The Court is also wholly unpersuaded by Plaintiff's argument that because Smoothline is the 'exporter from' Hong Kong, it must *also* be the 'importer into' the United States . . . .  This is contrary to logic; the very division between the two words suggests division of roles.").  The retailers, not Michilin or Intek, imported the products that were sold "FOB China" because the retailers took title in China, appointed a forwarder or broker, and controlled the manner and means of importation.  See Pl.'s Ex. 2224 at INT 07985; see also Cybiotronics, 130 F. Supp. at 1174 (shipments of

_____

[16]The shredders shipped into the United States by either Axeus or Intek in this manner were: TQ80M, LQ60B, DQ60B, DQ80B, DSD160D, DXD120D, and MQ60B.  Def. Br. in Opp. Ex. D, Seung Lee Aff. at 2, 4.  The LQ60B and MQ60B involved Axeus only and not Intek.  Id.

samples to the United States were not "imports" where title transferred in Hong Kong).

Michilin's motion for a new trial on these issues is **DENIED**.  Intek's request for a judgment that Intek "did not make and is not liable for any offers to sell, sales, or importations that occurred prior to the importation of Intek in November 2005" is **DENIED** except insofar as the activities for which Intek is liable began in November 2005 or thereafter.  Intek's motion for a new trial on this issue is **DENIED**.

### 3.    Infringement of the '780 Patent

A determination of infringement involves a two-step analysis.  "First, the claim must be construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process."  Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1364 (Fed. Cir. 2001) (quoting Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993)).  Claim construction is a "question of law, to be determined by the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 384, 116 S. Ct. 1384, 1393 (1996).  The Court construed the disputed claims in both patents in its December 15, 2006, Order and Opinion [Doc. No. 97] ("Markman Order").

Both parties seek judgment as a matter of law as to Fellowes' claim that the Diamond Cut shredders infringe claim 3 of the '780 patent.  Defendants stipulate to infringement of the '559 patent, so the Court need not address that patent.  Turning to the second step in its analysis of the '780 patent, the Court must compare the Diamond Cut shredders to the claims in the '780 patent. The Diamond Cut shredders infringe if they "'incorporate[] every limitation of a claim, either literally or under the doctrine of equivalents.'"  MicroStrategy, Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005) (quoting Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1732 (Fed. Cir. 2005)); see also Litton Sys., Inc. v. Honeywell, Inc., 140 F.3d

1449, 1454 (Fed. Cir. 1998).  Summary judgment on the issue of infringement is proper "when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents."  PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005).  "If . . . even one claim limitation is missing or not met, there is no literal infringement."  MicroStrategy, 429 F.3d at 1352.  "A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method."  AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1326 (Fed. Cir. 2007); see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608-09, 70 S.Ct. 854, 856, 94 L. Ed. 1097 (1950).

The '780 patent teaches a "cross cutting cylinder for shredding paper."  Pl's Ex. 1, '780 patent, col. 1, lines 4-5.  Claim 3 is dependent on claim 2, which is in turn dependent on claim 1. Claim 3 is therefore construed to "incorporate by reference all the limitations of the claim to which it refers," i.e. claims 1 and 2.  35 U.S.C. § 112 ¶ 4.  Claims 1, 2, and 3 state as follows:

> 1.  A cutting cylinder comprising a shaft having at least two spaced apart cutting disks each having at least two circumferentially spaced teeth and a spacer located between two adjacent disks wherein the cutting disks are displaced in the longitudinal direction of the cutting cylinder, and the surface of the spacer has a linear measure greater than the distance between the two adjacent disks.
>
> 2.  The cutting cylinder of claim 1 wherein the peripheral cross-section of the spacer consists of a shape selected from the group consisting of a depression, a notch, a rounded notch, an annular groove, a V-shaped groove, an incline on one side, an inverted V-shape, an inverted arcuate V-shape, and an inverted U-shape.
>
> 3.  The cutting cylinder of claim 2 wherein the peripheral cross-section of the surface of the spacer consists of a V-shaped notch.

19

Id., cols. 3- 4, lines 47-49, 1-13.  Claim 3 uses the term "consists of," which, the parties agree,

limits the claim to what follows the term "consists of" only, meaning "the V-shaped notch must

cover the entire peripheral cross-section of the surface of the spacer."  Jury Instructions at 23.

See Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1360 (Fed. Cir. 2006) ("The

phrase 'consisting of' signifies restriction and exclusion of unrecited steps or components.").

    This case comes down to a straightforward issue centering on claim 3 alone: whether the

peripheral cross-section of the surface of the spacer in the Diamond Cut shredders "consists of,"

or has only, a "V-shaped notch."  No reasonable jury examining the evidence and trial testimony

could find that the Diamond Cut shredders do not meet this limitation.  First, the area that

extends from one of the Diamond Cut's cutting disks to an adjacent cutting disk fits easily within

the Court's construction of "spacer": a "device that creates a space between two cutting disks on

the cutting cylinder, the space having a width just slightly greater than an interleaving cutting

disk from a mating cutting cylinder."  Markman Order at 30-31.  The Diamond Cut's spacer is

formed by two pieces that fit together along the cutting cylinder, creating a "space between

cutting disks."[17]  That the parts which form the spacer are physically connected to the cutting

disks does not disqualify them from reading on the '780 patent, since the Court ruled that the

spacer "may be separate from or integral with the cutting disk(s)" as long as it is "positioned

between two adjacent cutting disks."  Id. at 31.  Properly identifying the spacer requires properly

identifying the cutting disk.  As Dr. Lee A. Swanger, the Plaintiff's technical expert, testified,

the cutting disk in the Diamond Cut is comprised of two "wavy" blades separated along the

cutting cylinder by a plastic "reinforcing member."  5/09/07 Tr. 919:11-14.  This configuration

---

[17]A cutting cylinder is a "device for cutting paper that has a generally cylindrical overall
shape."  Jury Instructions at 21.  There is no dispute that Defendants' device has such a cylinder.

meets the Court's definition of "cutting disks" as "generally round or ring-shaped elements that are designed for cutting paper" that need not be limited to a unitary piece or multiple pieces. Markman Order at 23-24. Dr. Swanger's interpretation of the cutting disks and spacers recognizes that, in order for the shredder to cut paper, the spacers must be just wide enough for an interleaving disk from the opposing cutting cylinder to fit. Indeed, it is the interaction of opposing disks along parallel cutting cylinders that creates the shearing action necessary to cut the paper. See Pl.'s Exs. 1501 & 1, '780, col. 2, lines 62-64 ("[T]he disks 14 on one cylinder are positioned so that a disk 14 from one cylinder fits within the space between two adjacent disks."). During his deposition, Defendants' expert, Dr. Elliot L. Stern, did not contradict what Dr. Swanger identified to be a spacer. Pl.'s Br. Opp. [Doc. No. 135] Ex. E, 3/29/07 Stern Dep. Tr. 122:10-124:4 ("Q. Is what Dr. Swanger identifies as a spacer a spacer under the Court's definition of spacer? A. Yes."). In sum, the Diamond Cut has spacers, spaced apart cutting disks, circumferentially spaced teeth, and parallel cutting cylinders—the precise configuration described in the '780 patent.[18]

Defendants' central argument is that the *surface* of their spacer does not "consist of" a "V-shaped notch" because the area extending upward from the bottom of the spacer resembles a "wine glass" and not a "V," and, while there is "admittedly" a "V-shaped notch" at the *bottom* of the spacer, it does not extend from one cutting disk to the other and therefore cannot be the

---

[18]During oral argument, Defendants argued that their spacer does not infringe because it is covered by a stripper and does not interact with paper. 5/11/07 Tr. 1312:7-25. As the Court indicated at trial, it is not persuaded by this argument. Id. at 1334:11-14. Defendants were unable to provide any legal authority for the proposition that their product must function in a certain way to infringe, and counsel admitted there was none. Neither the claims nor their construction requires the spacer to be uncovered. This argument is notably absent in Defendants' post-trial brief. To the extent that Defendants are still wedded to it, it is rejected.

spacer.  Defs.' Br. at 2.  Defendants rely solely on a blown-up photograph of the Diamond Cut

DQ120D shredder's disks.[19]  Defendants' "wine glass" description is an exaggeration, as is their

statement that their spacer "curves in various directions" from the outer portion of the blades to

the center.  Id.[20]  The indented area in between the DQ120D's disks falls squarely within the

Court's construction of a "notch" as an "angular or V-shaped cut, indentation, or slit."  Jury

Instructions at 22.  Defendants reach for a narrow interpretation of "V-shaped" that assumes that

"V-shaped" means a "V" comprised of straight lines.  Such a constricted reading of the patent is

absent in the claims and the Court's construction, and indeed contradicts both.  The Court

construed claim 3 to mean, "The peripheral cross-section of the surface of the spacer has a V-

shaped cut, indentation, or slit."  Id. at 23.  The parties' *agreed-upon* definition of "V-shaped

*groove*" in claim 2, which the Court adopted, confirms that an overly rigid reading of "V-

shaped" is not only unnecessary but illogical.  A "V-shaped groove," all parties agreed at the

time of the Markman hearing, is "a furrow or channel having a V-shape."  Id. at 22.  A furrow,

generally speaking, is the V-shaped trench formed by a plow.  See Webster's Third New Int'l

Dictionary at 924 ("a trench in the earth made by a plow.").  Many are too young to have seen or

been on a farm, but those who have would realize that a perfect "V" is seldom, if ever, made by a

plow that cuts a furrow.  Besides, Defendants offered *no actual evidence*, only attorney

argument, that the spacer is not "V-shaped."[21]  The argument is mere assertion, and provides no

---

[19]All of the Diamond Cut shredders have the same configuration as either the DQ120D or
DQ61Ba, and there is no dispute that the differences between those two models are immaterial.

[20]Was there fortified wine in the wine glass that Defendants' counsel refers to?

[21]In fact, Dr. Stern admitted that the Diamond Cut consisted of a "V-shaped notch":

Q.  Does the peripheral cross-sections of the surface of that red highlighted part [on

reason why calling something a "wine glass" (setting aside whether that accurately describes the

spacer) precludes it from being "V-shaped."   The suggestion that the "V" in claim 3 must be

composed of perfectly straight lines is unsupported by the claims and contradicted by common

sense.  Defendants only confuse matters by attempting, as they did during trial, to compare their

product to figures in the '780 patent and Fellowes' own shredders.   Neither of these may be used

to limit the scope of the claim itself because it would import limitations onto the claim from the

specifications.  See MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1333 (Fed.

Cir. 2007) ("[P]atent coverage is not necessarily limited to inventions that look like the ones in

the figures."); Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005).

Defendants' contention that their device does not "consist of" a "V-shaped notch" is

further contradicted by Michilin's own engineering drawings, the exhibits, and the expert

witness testimony (not to mention anyone who has been to a farm and seen a furrow).   The

engineering drawing of the DQ120D, which T.C. Wang testified accurately depicts the Diamond

Cut, clearly and unmistakably shows two *straight* lines intersecting in the shape of a "V."  Pl.'s

Ex. 1501; 5/07/07 Tr. 713:13-21.   Dr. Swanger testified that in his opinion the surface of the

DQ120D spacer extends from one disk to the other and "certainly has a V shape," and that the

Diamond Cuts meet all of the elements of claim 3.  5/08/07 Tr. 854:6-13.   Even a cursory glance

---

Plaintiff's Deposition Exhibit 2178] consist of a V-shaped notch?

A.  If in consideration of the product one is excluding the integral component of the
stripper, therefore, looking at an alternative that is not specifically the assembly of the
DQ120D or the DQ61, the, as I attempted to answer looking at that, with those
exclusions, *that portion does qualify as a spacer with a V-shaped notch as defined by the
Court*.

Stern Dep. Tr. 125:13-24 (emphasis added).

at Plaintiff's Exhibit 56, a photograph of a physical exhibit showing a cross-section of the

DQ120D created by Dr. Swanger, confirms that the *entire* surface of the spacer, not just the

bottom, is "V-shaped."  Dr. Swanger, a mechanical engineer, created the exhibit photographed in

Exhibit 56 by cutting the DQ120D in half and filling the spaces with epoxy.  Exhibit 56 is

persuasive because claim 3 expressly refers to a "peripheral cross-section" of the spacer,

allowing one to see the device as if broken in half like a dinner plate.

Defendants valiantly attempt to get around the Court's construction of "spacer" by

asserting that they do not have a spacer whatsoever.  They claim that Fellowes disclaimed a

"blade with a half spacer coupled to another blade with a half spacer, as utilized in the diamond

cut shredder" in statements to the USPTO in relation to U.S. Patent No. 5,988,542

("Henreckson") during prosecution of the '780 patent.  Def.'s Br. at 2.  Dr. Stern tried to bolster

this point at trial by testifying, in contradiction to his deposition testimony, that the Diamond

Cuts "do not contain a spacer."  5/10/07 Tr. 1211:13-25.[22]  This argument is basically dead on

arrival: the Court dealt extensively with Henreckson and the doctrine of prosecution disclaimer

in its Markman Order.  See Markman Order at 27-31; see Def.'s Ex. 10, Henreckson & Ex. 36,

'780 Patent Response filed July 21, 2000 at FE 000507.  The Court found no disclaimer then

and, for similar reasons, finds none now.  At issue is the following statements made to the

USPTO by the patentee: "In addition, Henreckson et al. do not disclose a separate spacer

between cutting disks where the linear measure of the spacer along its surface is greater than the

---

[22]The Court in its 25 years on the bench has seen hundreds of experts testify who were extensively deposed.  Dr. Stern submitted an errata sheet to his expert deposition which made some 80 changes to his testimony, 9 of which changed a "yes" to a "no" or vice versa.  Pl.'s Ex. 5024.  The Court had never previously seen an "expert" who seemingly did not know the difference between yes and no, or changed so many answers to his testimony.

distance between two adjacent disks. It is respectfully submitted that Henreckson et al. teach the abutment of two cutting disks against each other to form a single cutting unit separated from other cutting units by spacers 30 and 36. The linear measure of the spacer of Henreckson et al. is equal to the distance between adjacent disks." Id. These sentences, when read in context with the rest of the four paragraphs devoted to Henreckson, were an effort by the patentee to get around Henreckson on the basis that it did not have the spacer *surface* claimed in the '780 patent. There simply was no "clear and unmistakable surrender" of the particular configuration purportedly utilized in the Diamond Cut. See Conoco, 460 F.3d at 1364.

Defendants' final argument is that if the Diamond Cut infringes claim 3, then claim 3 is anticipated by Taiwanese Application No. 84217868A01 ("TW 'A01"), and invalid under 35 U.S.C. § 102(a) (providing that an invention cannot be patented if, *inter alia*, it is "patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent[.]"). The Court sees no reason to disturb the jury's well-considered finding that the Defendants failed to prove by clear and convincing evidence that the '559 and '780 patents are invalid. Nothing in the text of TW 'A01 remotely teaches a V-shaped spacer. See Defs.' Ex. 365 (English translation). The only thing in TW 'A01 that Defendants contend is anticipatory is Figure 1, which they say shows a "V-shaped notch." The jury did not buy this—and neither does the Court. Defendants' motion for judgment as a matter of law that the '780 and '559 patents are invalid is **DENIED**. Their motion for a new trial on validity of both patents is also **DENIED**.

In conclusion, the Court **FINDS** that there is no genuine dispute that the Diamond Cut shredders have a "spacer" that "consists of a V-shaped notch." Accordingly, because all other elements of claims 1, 2, and 3 are met, there is no genuine issue of material fact that Defendants

literally infringed claim 3 of the '780 patent, and judgment as a matter of law is warranted.

### C.     Inducement

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  "'In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement,' and 'second,' that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'"  Cross-Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1312 (Fed. Cir. 2005) (quoting MEMC Elec., 420 F.3d at 1378 & Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)).  The Federal Circuit recently held that the "intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement.  Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement."  DSU Med. Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1306 (Fed. Cir. 2006).  "Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."  Id. (citing MGM Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 936-37, 125 S.Ct. 2764, 2780, 162 L. Ed. 2d 781 (2005); Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990)).  The intent element is satisfied by a showing that the defendant "knew or should have known his actions would induce actual infringements."  Manville, 917 F.2d at 553.  Such intent may be proved using circumstantial evidence.  DSU Med. Corp., 471 F.3d at 1306 (citations omitted).

Defendants do not dispute that their customers, the retailers to whom they sell accused shredders, offer them for sale and sell them at their stores.  Defendants knew of the retailers' actions and intended that they occur.  See Dynacore Holdings Corp. v. U.S. Philips Corp., 363

F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement."). The evidence is that Defendants were aware of the patents approximately when this suit was brought on May 23, 2006.  5/08/07 Tr. 782:24-783:7, T.C. Wang Test.  Defendants knew or should have known that the retailers' actions after May 2006 would constitute infringement. Both defendants took affirmative steps to induce another's infringement, in the case of Michilin, by designing and manufacturing the accused products, and, in the case of both defendants, by actively soliciting retailers to sell them and by supplying them to retailers.  Fellowes has met its burden to show that Defendants' actions induced infringement and that Defendants knew or should have known that their actions would cause such a result.  Accordingly, Intek and Michilin are liable, as a matter of law, for inducement of infringement of the '559 and '780 patents under 35 U.S.C. § 271(b) for the period beginning May 2006.

## III.   CONCLUSION

In conclusion, the Court **FINDS**, as a matter of law, that (1) Michilin and Intek offered to sell and sold accused shredders in the United States during the terms of the '780 patent and '559 patent; (2) Michilin imported into the United States infringing shredders that it sent to Underwriters Laboratory; (3) Intek imported infringing shredders to its warehouse in California; and (4) the accused Diamond Cut shredders literally infringe claim 3 of the '780 patent.

Accordingly, the Court **FINDS** that Intek and Michilin, as a matter of law, directly infringed claim 3 of the '780 patent in violation of 35 U.S.C. § 271(a) and both defendants induced infringement of the '780 and '559 patents beginning in May 2006 in violation of 35 U.S.C. § 271(b).  Defendants admit to infringing the '559 patent, and accordingly the Court

27

**FINDS** that Defendants did directly infringe claims 1, 14, 15, and 16 of the '559 patent.  The Court **FINDS**, in accordance with the jury verdict, that U.S. Patent No. 6,260,780 and U.S. Patent No. 7,040,559 are both valid patents.  The parties' motions for judgment as a matter of law are disposed of in accordance with the rulings made herein.  Defendants' motions for a new trial on any and all issues are **DENIED**.  A trial on damages will begin on July 17, 2007.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record by fax and mail.

**IT IS SO ORDERED.**

_____/s/_____

UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

June 22, 2007